IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

BETTYE PRITCHETT,             )
                              )
         Plaintiff,            )
                              )
v.                            )   CIVIL ACTION NO. 16-0413-MU
                              )
NANCY A. BERRYHILL,            )
Acting Commissioner of Social  )
Security,[1]                   )
                              )
         Defendant.            )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Bettye Pritchett brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her claim for Supplemental Security Income ("SSI"), based on disability. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 28 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, … order the entry of a final judgment, and conduct all post-judgment proceedings.")). *See also* Doc. 30. Upon consideration of the administrative record, Pritchett's brief, the Commissioner's brief, and all other documents of

---

[1] Nancy A. Berryhill has replaced Carolyn W. Colvin as acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill has been substituted as the defendant in this action. *See* 42 U.S.C. § 405(g).

record, it is determined that the Commissioner's decision denying benefits should be reversed and remanded.[2]

## I. PROCEDURAL HISTORY

Pritchett applied for SSI, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, on December 10, 2012, alleging disability beginning on December 7, 2012. (Tr. 189, 195). Her application was denied at the initial level of administrative review on March 1, 2013. (Tr. 126-30). On March 14, 2013, Pritchett requested a hearing by an Administrative Law Judge (ALJ). (Tr. 134). After a hearing was held on August 25, 2014, the ALJ issued an unfavorable decision, finding that Pritchett was not under a disability from the date the application was filed through the date of the decision, September 16, 2014. (Tr. 34-50). Pritchett appealed the ALJ's decision to the Appeals Council, which denied her request for review of the ALJ's decision on June 17, 2016. (Tr. 1-4).

After exhausting her administrative remedies, Pritchett sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on November 8, 2016. (Docs. 11, 12). On January 20, 2017, Pritchett filed a brief in support of her claim. (Doc. 16). The Commissioner filed her brief on May 12, 2017. (Doc. 24).

---

[2] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 28 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

The parties waived oral argument. (Docs. 27, 29). The case is now ripe for decision.

## II. CLAIMS ON APPEAL

Pritchett alleges that the ALJ's decision to deny her benefits is in error for the following three reasons:

1. The ALJ's finding that Pritchett's carpal tunnel syndrome, hypertension, and headaches are non-severe impairments is not supported by substantial evidence;

2. The ALJ failed to apply the Eleventh Circuit's pain standard correctly; and

3. The ALJ failed to develop a full and fair record by not ordering objective medical testing for carpal tunnel syndrome, such as nerve conduction testing. (Doc. 16 at p. 2).

## III. BACKGROUND FACTS

Pritchett was born on April 23, 1961 and was 51 years old at the time she filed her claim for benefits. (Tr. 189). Pritchett alleged disability due to high blood pressure, high cholesterol, and carpel tunnel syndrome. (Tr. 224). She attended regular education classes and graduated from high school in 1979. (Tr. 225). She worked from 1989 to 2001 as a sewing machine operator, and she worked as a housekeeper in 2005. (Tr. 216, 233). She engages in limited daily activities, such as sleeping, watching television, walking in her yard, and light chores around the house in 15-minute increments. (Tr. 241). She is unable to fix her hair, shave, or button, zip, or unfasten clothes because of pain in her hands. (Tr. 242). She cannot prepare meals because she drops dishes and food. (Tr. 243). She can pay bills, count change, and handle a savings account, but she cannot use a

checkbook because writing is very difficult because her "hands hurt too bad." (Tr. 244-45). She does not drive. (Tr. 244). After conducting a hearing, the ALJ made a determination that Pritchett had not been under a disability during the relevant time period, and thus, was not entitled to benefits. (Tr. 34-50).

## IV. ALJ'S DECISION

The ALJ made the following relevant findings in her September 16, 2014 decision:

> The claimant's hypertension, high cholesterol, headaches, and carpal tunnel syndrome are considered nonsevere impairments. The claimant's symptoms and diagnoses of hypertension and carpal tunnel syndrome are seen throughout the record (Ex.'s Bl F, B2F, B7F, and lOF). The undersigned carefully considered all of the evidence of record and based on that review discussed in detail below, it is clear that these impairments do not cause more than slight limitation in her capacity to perform work activity. Nevertheless, the undersigned considered the claimant's impairments collectively, severe and nonsevere, in assessing the claimant's residual functional capacity.
>
> * * *
>
> As for as the claimant's carpal tunnel syndrome, the claimant testified at the hearing she has hand pain and she has difficulty holding objects or writing. The claimant was diagnosed as having bilateral carpal tunnel syndrome in or about 2004, which was more than two years prior to the date she stopped working; she earned 12,006.00 in 2006 (Ex.'s B10D and Bl0F). In 2010, the claimant's treating physician wrote the claimant had reduced grip strength, but he did not offer any specific descriptions of the claimant's carpal tunnel syndrome symptoms (Ex. 7F/40). The claimant's treating records at Yellow Bluff Rural Clinic generally reveal more complaints of back pain than hand pain. Since the claimant's onset date, she has not been treated by a neurologist for her carpal tunnel syndrome. She testified she takes pain medication for her condition. She has not been referred for surgery for this condition. On February 14, 2013, the claimant was examined by a consultative examiner, Walid Freij, MD, who noted the claimant, was diagnosed with carpal tunnel syndrome and she uses splints on her wrists. Dr. Freij reported the claimant's "diagnosis was made clinically based on numbness sensation she had in the hands for that duration." Dr. Freij noted, "<u>No nerve conduction test was</u>

4

performed"(Ex. B2F). The consultative examiner noted the claimant had positive Tinel's sign in both wrists;[3] however, the sensory and coordination examinations were unremarkable (Id.). The examination by Dr. Freij reveals the claimant has no motor deficits, no atrophy, and no sensory deficits (Id.). After completing the examination, Dr. Freij, diagnosed the claimant with carpal tunnel syndrome. He opined the claimant's "repetitive motion at the wrists would have to be limited because of the possibility of carpal tunnel, although that is not proven by electrical testing" (Id.). While the records reveal some complaints regarding carpal tunnel syndrome, the claimant's medical treatment is not consistent with an individual who suffers from severe carpal tunnel symptoms. The medical records lack any nerve conduction studies and there are no recommendations for surgical intervention. While the claimant has been diagnosed with carpal tunnel syndrome, the evidence does not support that these symptoms cause more than a slight limitation in the claimant's ability to work. Even so, the undersigned has considered the claimant's diagnoses and limitations from this condition in the established residual functional capacity by limiting the claimant to only frequent bilateral gross and fine manipulation, which includes frequent handling and fingering.

* * *

**4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant is limited to never climbing ladders, ropes, or scaffolds. She is restricted to frequent bilateral gross and fine manipulation, which includes frequent handling and fingering. With regard to environmental limitations, she is restricted to no exposure to excessive vibration, operational control of moving machinery and unprotected heights, and hazardous machinery.**

* * *

In the case at bar, the claimant is currently a 53-year old individual with a high school education who alleged disability due to high blood pressure, high cholesterol, and carpal tunnel syndrome. The claimant claimed she ceased work on December 31, 2011, because she was

---

[3] Tinel's sign is "a sensation of tingling, or of 'pins and needles' felt in the distal extremity of a limb when percussion is made over the site of an injured nerve; it indicates a partial lesion or early regeneration in the nerve." Stedman's Medical Dictionary 1619 (26th ed. 1995). A positive Tinel's sign is one indicator of carpal tunnel syndrome. *See Boone v. Apfel*, Civ. A. 98-1131-P-S, 2000 WL 284280, *3 (S.D. Ala. 2000).

"let go" from her job. She reported in her disability reported [sic] that even though she stopped working for other reasons, she feels her condition precluded work activity on December 7, 2012 (Ex. B5E). The claimant previously worked as a sewing machine operator and a housekeeper (Ex. BSE). The claimant alleged work activity is precluded because her condition limits her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, complete tasks, concentrate, and use her hands (Ex. B6E). The claimant indicated she receives medical treatment and prescription medication for her hypertension, cholesterol problems, and pain (Ex. 5E). She reported she uses "wrist bands" on both wrists for her carpal tunnel syndrome (Ex. 5E). The medical evidence reflects some treatment for the alleged impairments, but this evidence is only partially supportive of the claimant's allegations (Ex.'s 1F-10F).

The claimant completed a function report on January 2, 2013, describing her daily activities. She reported she lives with her family in a mobile home. She claimed she spent most of her day sleeping and watching television during the day. She reported she is able to perform household chores for 15-minute periods intermittently during the day. She reported she is able to dust or wash a few washes [sic] dishes. She reported she has difficulty fastening and unfastening clothing, bathing, shaving, and caring for her hair. She claimed she also has problems feeding herself because she drops plates and glasses. She reported that writing was difficult for her due to her hand pain. She reported she is unable to drive, but she also remarked she has "never driven" (Ex.B6E and B7E/3). In addition, she alleged her condition affects her sleep because her pain keeps her up during the night. She reported she uses braces at night for her hands. Despite these limitations, the claimant reported she is able to walk ten to fifteen yards, pay her bills,[4] socialize with her family, attend church twice a month, and follow instructions (Ex. B6E).

The claimant also completed a hand questionnaire in which she described her limitations more specifically. She reported she is right handed and that she has severe pain in her hands that prevent her from "engaging in most activities." As noted above she reported difficulty dressing and maintaining personal hygiene. She reported her daughters assist her with her hair car [sic]. She reported she does not cook because she loses her "grip." She reports she has "very little strength"

---

[4] The Court notes that while Pritchett stated in her Function Report that she is capable of paying her bills, she explained that because of her wrists problem she is limited in the ability to write, including writing checks. (Tr. 244-45).

in her hands. She claimed she tries to dust or wash dishes, but she generally has to stop due to the pain. She alleged she has difficulty turning a doorknob, writing with a pen or pencil, and typing on a keyboard. She claimed she had problems completing these forms (Ex. B7E). Nevertheless, as noted in the medical evidence the claimant did not present with chronic carpal tunnel complaints and specific medical treatment for this condition. As noted earlier, her condition is deemed nonsevere.

\* \* \*

At the hearing, the claimant testified she lives with her daughter in a house. She testified she is currently 5'7" and weighs 203 pounds. She testified she used to weigh 160 pounds two years ago, but she claimed she was depressed and gained weight. She testified she was not able to do the same things she used to be able to do. Even though the claimant testified she gained weight over the past two years, the undersigned noted at the hearing that the claimant's weight has generally been stable since her filing date as noted in the records from Yellow Bluff Rural Health Clinic through the time of the consultative examination in 2013 by Walid Freij, MD (Ex.'s B1F and B2F). On July 20, 2012, five months prior to onset, the claimant weighed 203.80 pounds. In February 2013, the claimant weighed 202 pounds and at the hearing, she testified she weighs 203 pounds. The records do not reveal a 40-pound weight gain in the last two years; the claimant's weight has remained stable as noted by the evidence.

The claimant also testified she does not currently have a driver's license, but she also testified she has never had one. During the hearing, she claimed her greatest problem is her back condition that began four to five years ago.[5] … The claimant testified she also has problems with her hands. She testified she is right handed but she has problems with both hands for the past five to six years. She testified she has difficulty holding objects; she testified she drops items. During the hearing, the claimant's attorney questioned her regarding her hand limitations. She testified she has problems writing due to numbness in her fingertips. The claimant reported she has to wear splints at night. … She testified her daughter or granddaughters help her fasten her clothing. She testified she is able to cook once or twice a week. She testified she is only able to lift five or ten pounds. She testified she tries

---

[5] Although the ALJ stated in her decision that Pritchett claimed that "her greatest problem is her back condition," the transcript of the hearing does not support that statement. At the hearing, the ALJ asked Pritchett which of her complaints was most severe, and Pritchett replied, "my back pain and my hand pain." (Tr. 60).

7

to wash dishes two to three times a week. She testified someone else usually has to finish the job for her, because she drops dishes. She testified she does laundry a couple times a week. She testified she does not mop or sweep. She testified she has no current hobbies; she testified she used to cook and garden. The claimant testified she attends church services once monthly. She testified on a typical day, she gets up and gets herself something to eat. She testified she spends the majority of the day watching television and resting. She testified she watches television two hours a day and she lies down four hours a day. She testified she goes to sleep around midnight. When questioned on how she spent the remainder of the day, she kept stating that she either lied down or watched television for the remainder of the day.

\* \* \*

Turning to the evidence of record, the record contains medical records that predate the relevant period to this decision (Ex. BIF, B9F, BlOF, and Bl IF with parts of Ex.'s 7F). These records covered treatments received prior to the claimant's alleged onset date. For this reason, those records prior to onset were considered for historical purposes only.

The record contains a physical examination on November 22, 2004, from the Neurology Consultants of Central Alabama. At this time, the claimant complained of numbness, swelling, and pain in the hands for one-year duration. She alleged her pain kept her up at night. She claimed she would occasionally drop things. The physical examination revealed the claimant was in "no acute distress." The claimant's neurological examination was generally unremarkable except for a decreased pinprick and light touch sensation over the lateral aspects of both palms, the index finger, and middle fingers. However, the claimant had a positive Tinel's sign bilaterally. The claimant was diagnosed with carpal tunnel syndrome at this visit. The undersigned notes this examination occurred approximately 10 years ago and the claimant's symptoms have remained generally the same. In addition, no nerve conduction studies were performed at this examination to confirm this diagnosis (Ex. B9F and BI0F).

\* \* \*

Prior to onset, the claimant's treating physician Edward Childs, MD, completed a medical source statement on July 5, 2011. The undersigned affords marginal weight to the opinion, as it is not fully consistent with the evidence of record and treatment provided. Dr. Childs provided a more limiting residual functional

8

capacity than the undersigned. Dr. Childs opined the claimant is capable of frequently lifting up to 10 pounds and occasionally lifting 20 pounds. Dr. Childs opined the claimant could frequently use her left and occasionally use her right hand for fine and gross manipulation. Dr. Childs opined that the claimant's pain is distracting and her side effects would limit her ability to work. However, when asked to "what extent have treatments for pain such as injections, nerve stimulation," and other forms [sic] used, Dr. Childs wrote no treatments of these types have been prescribed. If the claimant's back pain and carpal tunnel pain were so limiting, it stands to reason these options would be considered. The undersigned considered the entire record and noted Dr. Childs handled the claimant's complaints conservatively and symptomatically. The records do not reveal any chiropractic care, spinal injections, physical therapy, or surgical consultations. The undersigned finds the claimant's [sic] opinion is more based on the claimant's subjective complaints, rather than the objective medical findings noted in the record. Finally, this opinion was provided prior to the claimant's onset date, which is not part of the relevant period. Given all these factors, the undersigned affords marginal weight to the opinion by Dr. Childs (Ex. B11F).

Turning to the relevant period, the claimant reported for a consultative examination by Walid Freij, MD. Dr. Freij noted the claimant's history of back pain, radiating leg pain, numbness, and carpal tunnel syndrome. Dr. Freij noted the claimant had two "slipped discs in the lumbar spine." With regard to the carpal tunnel syndrome, he remarked that the previous "diagnosis was made clinically based on numbness sensation she had in the hands for that duration, although no nerve conduction test was performed." …With regard to the sensory exam, the claimant was "unremarkable to pinprick, light touch, vibration, and position sense," which is an improvement from 2004. The claimant was diagnosed with lower back pain with pain radiating to the lower extremities suggestive of lumbar spine radiculopathy and possibility lumbar spine spinal stenosis, mild scoliosis in the thoracic spine, carpal tunnel syndrome, and hypertension (Ex. B2F).

At the conclusion of the examination, Dr. Freij provided an opinion (Ex. B2F). Dr. Freij opined, "Based on the above history and physical examination patient would be able to job related activities that require her to sit, standing and walking would be limited because of the back pain. She would be able to lift and

9

carry, although the weights of these objects would have to be limited to no more than 20 lbs. Repetitive motion at the wrists would have to be limited because of the possibility of carpal tunnel, although that is not proven by electrical testing. Patient is able to hear and speak. Traveling can be done in moderation." The undersigned affords partial weight to the opinion of Dr. Freij. The physical findings regarding the claimant's back pain was generally unremarkable other than mild scoliosis in the thoracic spine and a limitation in flexion of the thoracolumbar spine. The claimant appeared in "no acute distress" and she used no assistive device at the examination. Dr. Freij opined the claimant would have lifting limitations, restrictions regarding sitting, standing, and walking due to back pain; however, there were no recent MRI or x-ray findings revealing a significant back problem. The exertional limitations are not entirely consistent with the actual findings made by Dr. Freij; rather, his opinion is more consistent with the claimant's complaints. Even so, the undersigned considers the claimant's back trouble and reduces the claimant to medium work with postural and environmental limitations. As for the claimant's hand pain, Dr. Freij noted the claimant would be limited "because of the possibility of carpal tunnel, although that is not proven by electrical testing." The undersigned finds this statement is consistent with the evidence and the undersigned did limit the claimant's fine and gross manipulation to a frequent basis. The remainder of the opinion is consistent with the evidence of record. Given all the above factors, the undersigned affords partial weigh [sic] to the opinion of Dr. Freij (Ex. B2F).

\* \* \*

In general, the records reveal that claimant received routine, conservative medical treatment for these symptoms with medication. The evidence shows a history of prescription treatment for pain, muscle relaxers, blood pressure medication, reflux medication, and cholesterol medication. No other methods of pain management were explored, such as epidural injections. In addition, the record does not show referrals for physical or chiropractic therapy, nor do the records reflect referrals for carpal tunnel or back surgery. Thus, the treatment records reveal conservative treatment for chronic complaints (Ex.'s B3F, B4F, B6F, B7F, and B8F).

\* \* \*

As for the claimant's carpal tunnel syndrome, the claimant described debilitating hand pain that causes her to lose grip on objects and keep her awake at night. The evidence shows a

diagnosis of carpal tunnel syndrome and a positive Tinel's sign (Ex.'s B2F and B9F and Bl0F). However, Dr. Freij notes the claimant's diagnosis was "clinically based on numbness and sensation" and "no nerve conduction test was performed." In addition, he reported in his opinion that he [sic] claimant's wrists would be limited due to the "possibility of carpal tunnel, although that is not proven by electrical testing." The objective findings do not substantiate the degree of the debilitating symptoms alleged by the claimant. The claimant has only taken pain medication and worn splints for her condition. No surgery has been suggested and no therapy has been provided for this impairment. Even so, the undersigned reduced the claimant's fine and gross manipulation to a frequent basis in the established residual functional capacity to account for the symptoms related to this impairment.

In sum, the above residual functional capacity assessment is supported by the objective evidence, treatment records, the claimant's activities, and the record as a whole. All evidence that was provided, as well as the claimant's allegations, has been used in producing the claimant's residual functional capacity assessment. The undersigned provided exertional, postural, manipulative, and environmental limitations in the established residual function capacity, which incorporate all the claimant's impairments, as they would affect the claimant's work activity. Given the established residual function capacity, the vocational expert testified there are jobs, other than the claimant's past relevant work, existing in significant numbers that the claimant could perform.

Consequently, even though the alleged impairments are considered severe, they are not considered disabling.

**5. The claimant is capable of performing past relevant work as a housekeeper (DOT 323.687-014), light, unskilled work with a specific vocational preparation (hereinafter "SVP") of two. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).**

At the hearing, the vocational expert testified the claimant had a past work history as a sewing machine operator (DOT 786.682-194), light, semi-skilled work with a SVP of three and a housekeeper (DOT 323.687-014), light, unskilled work with a SVP of two. Given the

11

established residual functional capacity, the vocational expert testified the claimant could return to her past work as a housekeeper but not a sewing machine operator. The vocational expert testified that the claimant could not perform her past work as a sewing machine operator, because this position requires constant fine and gross manipulation. In contrast, the vocational expert testified the housekeeper position would not be precluded by the current residual functional capacity. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. The current residual functional capacity finds the claimant is capable of medium exertional work with a limitation to frequent fine and gross manipulation. With the housekeeper position, the vocational expert testified position is generally performed at a light exertional level and the claimant actually performed it at a light level. Because the exertional requirements are less than the requirements established in the residual functional capacity, the claimant could return to her past work as a housekeeper. In addition, the vocational expert testified she could return to the housekeeper position even with the manipulative requirements being reduced to frequent activity. In addition, the vocational expert confirmed that if the residual functional capacity were reduced to a light exertional level, the claimant would still be capable of performing the work as a housekeeper as she performed it as well as it is generally performed in the national economy. Thus, given the established residual functional capacity, the claimant could return to her past relevant work as a housekeeper as actually and generally performed.

(Tr. 39, 40, 41, 42-43, 44, 45-46, 48-49).

## V. DISCUSSION

A claimant is entitled to an award of SSI benefits if the claimant is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful

12

activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). However, placement of the burden to prove disability on the claimant does not relieve the ALJ of the duty to develop a full and fair record. *See Sims v. Astrue*, Civ. A. No. 3:09-cv-366-CSC, 2010 WL 2952686, at *2 (M.D. Ala. July 26, 2010) (citing *Kelley v. Heckler*, 761 F.2d 1538 (11th Cir. 1985)).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations

omitted); see 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

As set forth above, Pritchett has asserted three reasons the Commissioner's decision to deny her benefits is in error. Based on the finding below that the third asserted error requires remand to the Commissioner, the Court pretermits its discussion of the remaining issues. *See Jenkins v. Colvin*, CA 2:12-00465-N, 2013 WL 3465190, at *2 (S.D. Ala. July 10, 2013).

Pritchett contends that the ALJ erred in this case because she did not develop a full and fair record, mainly because she did not seek a consultative examination that included nerve conduction studies even as she, at least in part, based her decision on the lack thereof. As noted above, even though a claimant has the burden of proving disability, the ALJ has a concomitant duty to develop a full and fair record. *See Sims*, 2010 WL 2952686, at *2 (citing *Kelley v. Heckler*,

761 F.2d 1538 (11th Cir. 1985)). In *Sims v. Apfel*, 530 U.S. 103 (2000), the Supreme Court stated that "Social Security proceedings are inquisitorial rather than adversarial;" therefore, the ALJ has a duty "to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 110-11, *quoted in Cox v. Astrue,* No. 5:11-CV-02319-LSC, 2012 WL 4008953, at *5 (N.D. Ala. Sept. 12, 2012). An ALJ's affirmative duty to develop a full and fair record, in certain cases, "extends to obtaining a consultative examination when the same would be of benefit in the administrative process." *Waits v. Astrue*, CV 12-J-2371-NE, 2013 WL 625311, at *4 (N.D. Ala. Feb. 20, 2013) (citing 20 C.F.R. §§ 404.1517; 416.917); *accord Cox,* 2012 WL 4008953, at *5 ("The Commissioner's duty to develop the record includes ordering a consultative examination if one is needed to make an informed decision.") (citing *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (citing, in turn, *Ford v. Sec'y of Health & Human Servs.*, 659 F.2d 66, 69 (5th Cir. Unit B 1981))). "The failure of an ALJ to order a consultative examination, when such an evaluation is necessary to make an informed decision, constitutes justifiable cause for a remand to the Commissioner." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1372 (N.D. Ga. 2006) (citing *Reeves*, 734 F.2d at 522 n.1). "In determining whether it is necessary to remand a case for development of the record, [a court should consider] 'whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Salazar v. Comm'r of Soc. Sec.*, 372 F. App'x 64, 67 (11th Cir. 2010) (quoting *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (per curiam)).

In her decision, with regard to Pritchett's carpal tunnel syndrome, the ALJ concluded that "[t]he evidence shows a diagnosis of carpal tunnel syndrome and a positive Tinel's sign." She also acknowledged that Pritchett "described debilitating hand pain that causes her to lose grip on objects and keep her awake at night." However, because Dr. Freij noted that her "diagnosis was 'clinically based on numbness and sensation' and 'no nerve conduction test was performed,'" and because she "has only taken pain medication and worn splints for her condition" and "[n]o surgery has been suggested and no therapy has been provided for this impairment," "[t]he objective findings do not substantiate the degree of the debilitating symptoms alleged by the claimant." Based on these limited findings, the ALJ, reached the conclusion that a reduction of Pritchett's fine and gross manipulation to a frequent basis (rather than constant) in her residual functional capacity assessment accounted for the symptoms related to this impairment. The ALJ made this conclusion even thought the consultative examiner opined that "[r]epetitive motion at the wrists would have to be limited because of the possibility of carpal tunnel, although that is not proven by electrical testing." (Tr. 297). In addition, even though it predated the date of onset in this case by about seventeen months, the ALJ acknowledged the Medical Source Statement (MSS) completed by Pritchett's treating physician, Dr. Edward Childs. (Tr. 45). In the MSS, Dr. Childs opined that Pritchett could frequently use her left and ***occasionally*** use her right hand for fine and gross manipulation.[6] (Tr. 380-84) (emphasis added). The Vocational Expert testified at

---

[6] The ALJ accorded only marginal weight to the opinions of Dr. Childs because

the hearing that the ability to only occasionally use her right hand for fine and gross manipulation would erode the full range of housekeeper positions. (Tr. 75).

A review of the ALJ's decision reveals that much of the discounting of Pritchett's reported impairments due to her carpal tunnel syndrome was based upon the lack of nerve conduction or other nerve studies. The full or partial rejection of the doctors' opinions concerning her hand restrictions and the questioning of Pritchett's subjective complaints make it seem as if the ALJ "crafted limitations [concerning the use of Pritchett's wrists and hands] to the VE in [her] hypothetical out of thin air." *See Waits*, 2013 WL 625311, at *4. In determining that Pritchett could frequently use both hands for fine and gross manipulation, she seemingly ignored Pritchett's consistent statements of limitations in using her hands for fine and gross manipulation, as well as the opinions of the physicians who have examined her for this impairment. The ALJ appears to substantiate her conclusions concerning Pritchett's carpal tunnel syndrome impairment in large part to the lack of nerve conduction or other electrical testing. The instant case bares similarities to the *Sims* case; therefore,

---

he provided a more limiting FRC than she did, because she opined that if Pritchett's pain was so limiting, she would have had injections and other treatments, which Dr. Childs confirmed that she had not had, because she believed his opinion was based more on Pritchett's subjective complaints, rather than objective findings, and because the opinion predated the onset date. (Tr. 45). The Court notes that the ALJ's conclusion that Dr. Childs's opinion was based on subjective complaints seems to be contrary to records in the transcript that at least two other physicians diagnosed Pritchett with carpal tunnel syndrome based on a positive Tinel's sign and other objective testing. The questionable conclusion of the ALJ here only strengthens the argument that she should have ordered nerve conduction studies if she believed that Pritchett's carpal tunnel syndrome could only be proven by such testing.

17

the Court finds that it is instructive here. *See Sims v. Astrue*, Civ. A. No. 3:09-cv-366-CSC, 2010 WL 2952686, at *2 (M.D. Ala. July 26, 2010).

In *Sims,* the plaintiff, who had lumbar degenerative disc disease, was sent for a consultative examination without a request for additional imaging. 2010 WL 2952685, at *4. Imaging had been done several years prior to the period at issue. *Id.* However, the claimant had been complaining of a worsening condition. Noting that such evidence is necessary "when the claimant's medical sources do not give sufficient medical evidence to make a determination as to disability," the court explained that it was "at a loss as to why the ALJ would order a consultative physical examination without also requesting additional imaging be done, particularly in light of the nature of the plaintiff's complaints." *Id*. This Court feels at a similar loss. The *Sims* court found that the "inadequate development of the record" necessitated remand because "the court [could not] determine whether the ALJ's conclusion that the plaintiff [was] not disabled [was] based on substantial evidence." *Id.* at *5. Likewise, here, this Court cannot determine whether the ALJ's conclusion that Pritchett was not disabled was based on substantial evidence. Frankly, the Court is unable to determine how the ALJ reached her conclusion that Pritchett could frequently use her hands for fine and gross manipulation without further development of the record and, therefore, cannot conclude that it was based on substantial evidence.

"In determining whether remand is appropriate in cases such as this one, the Court must balance an ALJ's duty to develop a full and fair record against a claimant's responsibility to prove disability." *Jenkins*, 2013 WL 3465190, at *6.

Considering the nonadversarial nature of Social Security administrative proceedings, the Court finds that the scale tips in favor of remand in this case.

## **CONCLUSION**

It is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff Bettye Pritchett's claim for benefits be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), *see Melkonyan v. Sullivan*, 501 U.S. 89 (1991), for further proceedings not inconsistent with this decision. The remand pursuant to sentence four of § 405(g) makes Plaintiff a prevailing party for purposes of the Equal Access to Justice Act, 28 U.S.C. § 2412, *Shalala v. Schaefer*, 509 U.S. 292 (1993), and terminates this Court's jurisdiction over this matter.

**DONE** this the **28th** day of **September, 2017**.

    s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**